UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

THE ESTATE OF SHEILA LINDQUIST, and
THE DEAN O. and SHEILA K. LINDQUIST
REVOCABLE GRANTOR TRUST,

      Plaintiffs,

vs.

TRANSAMERICA FINANCIAL ADVISORS, INC.

      Defendant.

Case No.: 23-CV-400

**JURY DEMAND**

## COMPLAINT

NOW COME the Plaintiffs, The Estate of Sheila Lindquist and the Dean O. and Sheila K. Lindquist Revocable Grantor Trust, by their attorneys Halling & Cayo, S.C., and for their Complaint against the Defendant, Transamerica Financial Advisors, Inc. ("Transamerica"), states as follows:

### JURISDICATION AND VENUE

1. The District Court has jurisdiction as a civil action arising under the laws of the United States pursuant to 28 U.S.C. § 1332 (Diversity of Citizenship).

2. Defendant Transamerica is a corporation formed within the state of Delaware with its principal place of business located at 570 Carillon Parkway, St. Petersburg, FL 33716.

3. Plaintiff, The Estate of Mrs. Sheila Lindquist was created by a Wisconsin Last Will and Testament dated April 5, 1999.

4. Plaintiff, The Dean O. and Sheila K. Lindquist Revocable Grantor Trust is a Wisconsin trust established via a Revocable Trust Agreement dated April 5, 1999.

5. Mrs. Sheila Lindquist passed away in New Richmond, WI on May 22, 2022.

6. The amount in controversy in this case exceeds $75,000.

## PARTIES

1. Plaintiff, The Estate of Mrs. Sheila Lindquist (the "Estate") was created by a Wisconsin Last Will and Testament dated April 5, 1999, naming Kurt Lindquist (resident of Amery, WI) as Personal Representative. Mrs. Lindquist passed away on May 22, 2022, in New Richmond, WI.

2. Plaintiff, The Dean O. and Sheila K. Lindquist Revocable Grantor Trust (the "Trust") is a Wisconsin trust established via a Revocable Trust Agreement dated April 5, 1999, naming Kurt Lindquist (resident of Amery, WI) as successor Trustee. On July 28, 2022, Kurt Lindquist and Robin Ruppert were appointed as Co-Trustees of the Trust.

3. Defendant, Transamerica Financial Advisors, Inc. ("Transamerica") (CRD #16164) is a corporation organized under the laws of the State of Delaware. Transamerica's principal place of business is located at 570 Carillon Parkway, St. Petersburg, FL 33716. Transamerica is a Broker-Dealer registered and regulated by FINRA.

## FACTUAL ALLEGATIONS

4. On February 17, 2013, Dean Owen Lindquist passed away. He was survived by his wife Sheila Lindquist and their two adult children, Kurt Lindquist and Robin Ruppert. At the time of his death, Mr. Lindquist had an Annuity with TransAmerica, policy number xxxxx7LK2, with a death benefit value of $1,163,898.

5. On April 12, 2013, Mrs. Lindquist, signed the paperwork opting to "continue the policy as my own deferred annuity/IRA." She designated her adult children, Kurt Lindquist and Robin Ruppert as 50/50 beneficiaries under the annuity contract. This spousal benefit election, a feature of the annuity, entitled her to continue to receive the benefits of the existing TransAmerica

Annuity with no restriction on withdrawing funds. Moreover, Mrs. Lindquist would receive the 6% guaranteed death benefit and she was only obligated to annuitize the investment at the age of 99.

6. On May 8, 2013, at the time of her late husband's death, Mrs. Lindquist opened an account with Transamerica listing her investment objectives as Growth and Income and her risk tolerance as Moderate, with a Long-Term retirement horizon.

7. Brian Campion Stern (the "Registered Representative"), served as an associated person (registered representative) with Transamerica at all times relevant to this Complaint. His CRD number is 3137402. As a Registered Representative for Transamerica, his duties included recommending and selling securities to investors, such as Mrs. Lindquist. At all times relevant to this Complaint, Mr. Stern was acting within the scope of his employment and/or agency for Transamerica and was acting in the furtherance of Transamerica's goals.

8. Rather than leave things as they were so that Mrs. Lindquist could continue to reap the benefits of the annuity purchased by her late husband, Mr. Stern recommended on or about May 17, 2013, that Ms. Lindquist surrender her husband's annuity. Mrs. Lindquist was 72 years old at the time.

9. Mr. Stern then proceeded to recommend and sell Mrs. Lindquist an Allianz Vision Variable Annuity (the "Allianz Annuity"), at a cost to Mrs. Lindquist of $600,000

10. Mr. Stern then sold Mrs. Lindquist additional illiquid investments, proceeding to concentrate Mrs. Lindquist's account in illiquid non-traded (and high commission) investments which caused Mrs. Lindquist to incur withdraw penalties and even have to take out a home equity line of credit to meet her cash flow needs during her life.

11. In addition to the Allianz annuity, Mr. Stern sold Mrs. Lindquist three investments

in Real Estate Investment Trusts ("REITs").

12. REITs are high risk, illiquid investments that are not registered with the SEC. Despite this fact, Mr. Stern recommended Mrs. Lindquist purchase a total of three REIT investment at a cost of $200,000 as follows: a $100,000 investment in the KBS Real Estate Investment Trust III (the "KBS REIT"), a $50,000 investment in the Cole Office & Industrial REIT (the "Cole REIT"), and $50,000 in Dividend Capital (these investments shall be collectively referred to as "the REIT Investments.") The REIT Investments were highly risky and were not an appropriate investment recommendation for Mrs. Lindquist.

13. Mrs. Lindquist was also sold a Transamerica Life Insurance Policy (Policy No. 2357) that was not suitable for her at the time that she was sold the policy. She had no need for life insurance, especially a policy with annual premiums that comprised a larger percentage of her available income.

14. In total, Transamerica, through its agent, recommended the purchase of $800,000 in illiquid investments that were not suitable for Mrs. Lindquist and she paid $58,682 in premiums for a life insurance policy that was not necessary or suitable for Mrs. Lindquist.

**The Allianz Annuity**

15. Transamerica and its agents recommended and sold Mrs. Lindquist the Allianz Annuity for $600,000 on or about May 8, 2013. The Allianz Annuity was illiquid and had a six-year surrender period where penalties would be incurred if funds were withdrawn from the annuity.

16. The Allianz Annuity had a high insurance fee and a very costly, unnecessary income rider that had sub-account restrictions such as a requirement for a large percentage being in fixed income components.

17. The income rider was inappropriate for investors with required minimum

distribution requirements and who had, as Mrs. Lindquist did, the need to make additional withdrawals to pay living expenses which made the rider illusory.

18. The Allianz annuity entirely failed to perform for Mrs. Lindquist during her life. She invested $600,000 in the Allianz Annuity in 2013 and withdrew $326,146 over the course of 9 years before she ultimately had to surrender the policy on July 21, 2020, to pay for necessary expenses, netting $323,979 in total.

19. As such, Mrs. Lindquist received a $50,000 return on a $600,000 investment over a 9-year period (amounting to less than 1% per year). This gain does not even come close to matching inflation.

20. Mrs. Lindquist would have been significantly better off if Mr. Stern had sold her investments that met her stated investment objectives and risk tolerance.

21. If Mr. Stern had left Mrs. Lindquist's funds in her husband's TransAmerica Annuity, her Estate (and thus the Trust from the pour-over will) would have been funded with at least an additional $864,000 (a total which includes the withdrawals she had made from her second annuity.)

22. Likewise, if Mr. Stern had recommended withdrawal of the funds from her husband's annuity but instead of the high commission illiquid investments, he actually sold her, he had recommended Mrs. Lindquist simply invest in a legacy mutual fund, like the Massachusetts Investors Stock Growth Fund, her Estate (and thus the Trust from the pour-over will) would have been funded with at least an additional $1,500,000 even after withdrawals.

**The REIT Investments**

23. The REIT investments that Mr. Stern sold to Mrs. Lindquist represent a substantial capital loss to Mrs. Lindquist's Trust/Estate. The REIT Investments, in addition to being highly

risky and illiquid, have extraordinary operating costs and the investments are illiquid, meaning they cannot readily be sold on an open market.

24. Rather than providing any income or growth, the Dividend Capital investment paid back its principal in 2015.

25. The Cole REIT has a listed value (9 years later) of $70,789. With that said, there is no apparent secondary market for the Cole REIT, nor any timeline for return of the funds Mrs. Lindquist invested 9 years ago.

26. The KBS REIT lists its value as $188,050 but just announced the suspension of redemptions and cut the distribution rate to investors and has no appreciable secondary market value.

27. The funds paid by Mrs. Lindquist for the REIT Investments are tied up in these high-commission illiquid investments without any meaningful prospect of return and a high likelihood of substantial or complete principal loss.

**The Life Insurance Policy**

28. In July 2013, Mr. Stern sold Mrs. Lindquist a life insurance policy with excessive premiums (over $25,000 per year) that was permitted to lapse around 2018. This provided no value whatsoever to Mrs. Lindquist or her Estate/Trust. Mrs. Lindquist had no need for life insurance, especially a policy with annual premiums that comprised a larger percentage of her available income. The logical conclusion is that the life insurance policy was sold to Mrs. Lindquist by Mr. Stern and Transamerica to earn a quick commission.

29. After Mrs. Lindquist passed away on May 22, 2022, Mrs. Lindquist's children gained access to her accounts and her son, Kurt, discovered that the investments in the accounts were not aligned with the stated risk tolerance or the stated investment objectives for Mrs.

Lindquist.

30. Only at this point was it discovered that Transamerica and its agents had sold unsuitable investments to Mrs. Lindquist, contrary to Transamerica's standard of care.

31. Pursuant to the doctrine of *respondeat superior*, Transamerica, is responsible for the conduct of their associated persons and/or registered representatives, employees, and agents acting within the scope of their employment/agency and in furtherance of the goals of Transamerica.

32. Therefore, Transamerica is liable to Mrs. Lindquist for the conduct of its associated persons and/or registered representatives, agents, and employees, including Mr. Stern.

33. Further, pursuant to the doctrine of apparent authority, Transamerica is responsible for the conduct of its associated persons and/or registered representatives, employees, and agents, whom they hold out as being able to conduct business on their behalf including recommending and selling securities.

34. Therefore, Transamerica is liable to Mrs. Lindquist for the conduct of their associated persons and/or registered representatives, agents, and employees, including Mr. Stern.

## CAUSES OF ACTION

### First Cause of Action: Negligence

35. The Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

36. As Mrs. Lindquist's broker-dealer, Transamerica and its agents (including Mr. Stern) owed Mrs. Lindquist a duty of care, including, but not limited to, the duty to inquire into her investment objectives, the duty to only solicit her to purchase securities suitable for her individual investment needs, the duty to disclose all material facts regarding the securities its agents solicited her to purchase, the duty to ensure that Mrs. Lindquist understood the benefits and

risks associated with the investments she was being solicited to purchase, and the duty to take reasonable steps to ensure that such transactions were consistent with the Mrs. Lindquist's financial circumstances, investment objectives, and risk tolerance.

37. Transamerica owed Mrs. Lindquist a duty to recommend only suitable investments. To ensure suitability, Transamerica was required to conduct appropriate due diligence with respect to the Allianz Annuity, the REITs, and the Transamerica Insurance Policy including providing appropriate training to their registered representatives who recommended and sold the Allianz Annuity, the REITs, and the Transamerica Insurance Policy to the public, including Mr. Stern.

38. The recommendation to purchase the Allianz Annuity was not proper for Mrs. Lindquist.

39. Given the entirely unsuitable nature of not just the initial unsuitable recommendation to twist[1] from the existing annuity to purchase the Allianz Annuity, but the ongoing restrictions regarding sub-account allocation, Transamerica breached its duty to Mrs. Lindquist.

40. Transamerica owed Mrs. Lindquist a duty to supervise the activities of their registered representatives, including Mr. Stern, to ensure that every recommended security was suitable for her as an investor.

41. Mrs. Lindquist was sold illiquid investments *as an alternative to traditional*, *growth* investments. The Allianz Annuity decreased liquidity, added substantial costs, and did not offer greater growth or benefits to Mrs. Lindquist; yet no one at Transamerica bothered to investigate the transactions to ensure that they were suitable for Mrs. Lindquist.

42. The Allianz Annuity had expensive fees and costs that ate into any gains realized

---

[1] FINRA defines Twisting as "trading among mutual funds, insurance products, and variable products."

by the sub-accounts. Transamerica was obligated to investigate these issues, but rather than thoroughly investigating the recommendations made by Mr. Stern to ensure that the investment recommendations were proper for Mrs. Lindquist, Transamerica chose to approve the sale of the Allianz Annuity that paid above market commissions to Transamerica regardless of whether the underlying use of the proceeds was reasonable or whether other investments without the same risks were available for purchase.

43. Investments in REITs are considered risky, complex, illiquid, private placement alternative investments that are reserved for high risk investors with significant capital reserves.

44. Mrs. Lindquist is not within the group of investors that should be sold these types of investments.

45. Mrs. Lindquist was sold three investments at a total cost to her of $200,000. The REIT investments were illiquid, meaning that they do not have any resale value unless someone is willing to buy the investment on a secondary market.

46. Typically, REIT investments are only sold on the secondary market at a deep discount. This is particularly true for aging REITs, as the chance that a REIT is going to pay out the principal investment decreases over time.

47. The promised returns of the REIT investments cannot justify the substantial risk to principal (a risk that always accompanies an illiquid investment) for investors with a moderate risk tolerance.

48. Transamerica was obligated to investigate these issues, but rather than thoroughly investigating the recommendations made by Mr. Stern to ensure that the investment recommendations were proper for Mrs. Lindquist, Transamerica chose to approve the sale of the high-commission REITs to Mrs. Lindquist.

49. Mrs. Lindquist was sold a Transamerica TransAce Life Insurance Policy on or about July 23, 2013.

50. According to the terms of the policy, Mrs. Lindquist was to make yearly premium payments of $29,341 for 20 years (with a total of $451,540 to be paid in premiums) and the policy carried a $600,000 death benefit.

51. Mrs. Lindquist made two premium payments towards the Transamerica Life Insurance Policy totaling $56,682.

52. At the end of the first policy year, the $27,287 premium only earned $395 of interest. The fees and cost of insurance were $13,988.

53. The policy lapsed in 2019When Mr. Stern was asked what happened to the policy after Mrs. Lindquist had passed away, he claimed that Mrs. Lindquist had assured him she was handling the premium from her checking account.

54. The reality was that Mrs. Lindquist did not have sufficient cash available to make the ongoing premium payments and that she was entirely reliant on Mr. Stern for the handling of her financial planning and that Mr. Stern had failed to take out the funds necessary, as he had done for the previous years, for Mrs. Lindquist to make the premium payments. As a result, the policy lapsed and the premiums paid for the investments were lost forever.

55. Mrs. Lindquist was already retired at the time that she was sold the Transamerica Insurance Policy and due to her advanced age, the cost of an insurance policy was too great.

56. Transamerica, by and through its agent, Mr. Stern, should have sold Mrs. Lindquist a broad and diversified portfolio of liquid investments (or simply left her in the annuity she inherited from her husband), not insurance coverage.

57. Transamerica's negligent acts were not discovered until after Mrs. Lindquist passed

away in May 2022.

Transamerica is liable for damages in an amount to be shown at trial.

### Second Cause of Action:  Negligence - Failure to Supervise

58. The Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

59. FINRA Rule 3110(a) sets a standard of care for the industry which requires each FINRA member to "establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD and FINRA rules."

60. FINRA Rule 3110(a) requires all brokerage firms to supervise their associated persons' compliance with all FINRA/NASD rules.

61. Transamerica and its agents (including Mr. Stern) owed Mrs. Lindquist a duty of care, including, but not limited to, the duty to inquire into Mrs. Lindquist's investment objectives, the duty to only solicit securities suitable for its customers, the duty to disclose all material facts regarding the securities its agents solicit, the duty to ensure that Mrs. Lindquist understood the benefits and risks associated with the investment being solicited, and the duty to take reasonable steps to ensure that such transactions were consistent with Mrs. Lindquist's financial circumstances, investment objectives, and risk tolerance.

FINRA Rule 2330 establishes an industry standard of care which requires a registered principal to review and determine whether to approve a customer's application for a deferred variable annuity before sending the application to the issuing insurance company. This must occur no later than seven business days after an office of supervisory jurisdiction receives a complete and correct application. A principal can approve the transaction only if it is suitable based on the factors that a registered representative must consider when making a recommendation.

62. Industry standards also require firms to establish and maintain written supervisory procedures reasonably designed to comply with FINRA rules and standards.

63. Firms must implement surveillance procedures to determine whether brokers have incidence rates of variable annuity exchanges that might show misconduct and have policies and procedures in place to address inappropriate exchanges. Firms also must create training programs for registered representatives who sell deferred variable annuities and for registered principals who review these transactions.

64. Transamerica had a duty to supervise its agents, including Mr. Stern, to ensure compliance with the regulations and protections otherwise established by the industry to protect customers from the negligence and fraud of its brokers.

65. Transamerica breached this duty by allowing Mr. Stern to sell the Allianz Annuity, the REIT Investments, and the Transamerica Life Insurance Policy to a customer that was retired, had little investment experience, and had very little tolerance for risk, particularly when the existing annuity she inherited from her husband was perfectly suitable for her and added no costs but would still see 6% returns until Mrs. Lindquist reached the age of 99.

66. Transamerica breached the duty it owed to Mrs. Lindquist by, among other things: (1) Failing to either develop adequate procedures to ensure the suitability of sales of investments, or to implement, follow, and enforce their own guidelines regarding the suitability of sales of securities; (2) Failing to ensure and have systems in place to ensure that the investments sold to Mrs. Lindquist were suitable; (3) Negligently training their associated persons and/or registered representatives, including Mr. Stern, about the investments he was selling, as required by FINRA, to meet their reasonable-basis suitability obligations; (4) Negligently permitting its registered representative to continue to give ongoing unsuitable investment advice regarding ongoing

payments into the annuity contracts and management of the sub-accounts; and (5) Negligently supervising Mr. Stern's sales of unsuitable investments and ongoing unsuitable recommendations to Mrs. Lindquist regarding payments into the annuity contracts and sub-account allocation.

67.     Transamerica's acts and omissions injured Mrs. Lindquist.

68.     Transamerica's negligent acts were not discovered until after Mrs. Lindquist passed in May 2022.

69.     But for Transamerica's omissions and inaction, Mrs. Lindquist would not have been sold unsuitable investments.

70.     Transamerica is liable for damages in an amount to be shown at trial.

### Third Cause of Action:  Breach of Fiduciary Duty

71.     The Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

72.     In Wisconsin, [a] fiduciary relationship results in the legal assumption of the obligation to act for another's benefit. The fiduciary's duty of loyalty is to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interests. Courts have characterized that obligation as one of fidelity and loyalty.

73.     Transamerica breached the fiduciary duty that was owed to Mrs. Lindquist in many ways, including, but not necessarily limited to, by: (1) failing to perform customer-specific suitability analysis to determine whether the Allianz Annuity, the REIT Investments, and the Transamerica Life Insurance Policy were suitable for Mrs. Lindquist; (2) failing to provide appropriate training to their associated persons and/or registered representatives, including Mr. Stern, who recommended and sold the Allianz Annuity, the REIT Investments, and the Transamerica Life Insurance Policy to Mrs. Lindquist; and (3) providing ongoing advice to Mrs. Lindquist that was not consistent with her investment objectives and risk tolerance.

74. The breaches of Transamerica's fiduciary duty were not discovered until after Mrs. Lindquist passed in May 2022.

75. But for Transamerica's omissions and inaction, Mrs. Lindquist would not have been sold unsuitable investments.

76. Transamerica is liable for damages in an amount to be shown at trial.

## Relief Requested

Mrs. Lindquist makes the following claims for relief:

a. Against Transamerica for an amount of damages to be determined at trial for negligence, negligent failure to supervise, and breach of fiduciary duty, of an amount not less than $845,000 lost directly from the recommendation to surrender Mrs. Lindquist's husband's annuity after his death;

b. Any other relief that the court determines to be just and equitable.

## Demand for Jury Trial

Plaintiffs demand a trial by jury on all claims so triable.

Date: June 14, 2023

HALLING & CAYO, S.C.
Attorneys for the Plaintiffs

s/ Sean M. Sweeney
SEAN M. SWEENEY
WI State Bar No. 1063452
sms@hallingcayo.com

320 E. Buffalo Street, Suite 700
Milwaukee, WI 53202
(414) 271-3400